**Pamela D More**
16352 E Ridgeline Drive
**Fountain Hills, AZ 85268**
Telephone: 602 5151586
**Email Address: stockbrokher@runbox.com**
**Lawyer's Bar Number:**
**Representing Self without a Lawyer  yes**



# United States District Court
## District of Arizona
## IN MARICOPA COUNTY

**Case Number: CV-24-00452-DLR**

**Pamela D. More**

**Name of Petitioner/Plaintiff**

**Mayo Clinic Hospital Phoenix**
**AKA MAYO CLINIC ARIZONA,**
**A Domestic Non-Profit Corporation;**
**Rachel Lindor, M.D.**

**Name of Respondent/Defendant**

**RESPONSE TO**
**DEFENDANT'S MOTIONS TO**
**DISMISS on Jurisdiction and**
**Statute of Limitations**

And to Defendants
Legal Arguments (II) A. B.C. D. E.

Honorable Douglas L Rayes

Judge

7 pages, Including cover

Plaintiff's

**Rebuttal to argument to Dismiss on Statute of Limitations**

(1)

David Goguen, J.D.

According to Arizona Revised Statutes Section 12-542(1)

*"Under what's known as the "discovery rule," Arizona courts have held that "the cause of action accrues in a medical malpractice case when the plaintiff (the patient who's suing) knows, or should reasonably know, that a negligent medical error caused the patient's injuries or losses."*

https://www.nolo.com/legal-encyclopedia/what-the-arizona-statute-limitations-medical-malpractice-lawsuit.html#:~:text=Under%20what's%20known%20as%20the,the%20patient's%20injuries%20or%20losses.

Defendant asserts Rand v Midland 9th Circuit (2021) applies, because in Midland the Court dismissed on the basis that Plaintiff, "possessed 'information of the circumstances to put a reasonable person on inquiry' that he had been injured" … more than four years before the filing". Midland isn't remotely on point here. Rand's asserted injuries were financial, not medical, nor were they a result of discrimination prohibited by Federal law. The litigation was a dispute over insurance contracts held in a Trust, between the Trustees of the Trust (and thus in possession of legal standing) and individuals (including Rand), who had no such standing. The Appellate Court dismissed Rand's claim, because, as it said, "a litigant must have a personal stake in the suit they seek to prosecute".

In rebuttal, Plaintiff argues that, when a discrimination claim arises in conjunction with medical negligence/malpractice, that the statute of limitations can only reasonably begin tolling at the time when the Patient/Plaintiff - who has, indeed (to paraphrase the decision in Midland) been *wholly preoccupied* on a veritable ***"quest of inquiries"*** in pursuit of the cause of his maladies - **finally achieves his goal, and obtains a formal medical diagnosis which stands in firm contradiction to the erroneous diagnosis provided by the negligent medical provider.**

The reason for this is obvious:  without a formal medical diagnosis to stand in contradiction to the erroneous diagnosis that originally caused the patient/Plaintiff harm,

(2)

the Plaintiff's *belief* that he has been harmed cannot be substantiated.

In a discriminatory medical misdiagnosis, a Plaintiff can well know that he has been injured, but he cannot prove it without the formal contradictory medical diagnosis necessary to venture into the extremely serious matter of holding the original medical provider to account in a court of law. This is especially true in the presence of a wildly off-the-mark *psychiatric* misdiagnosis, such as *"delusion disorder"*. A misdiagnosis which is psychiatric in nature places an even greater burden on a patient suffering from a debilitating physical malady.

A misdiagnosed patient is a unique victim of discrimination, in that the harm caused by the Defendant is injury to health. This injury, by definition, leaves the patient/Plaintiff burdened by ill (and possibly worsening) health, and thus uniquely ill-suited to be engaging in the frenzied herculean "quest of inquiry" that Midland (if it were remotely on point, which it is not) and Defense Counsel wish to Require of the Plaintiff. Ill health is also often accompanied by financial set-backs and transportation restrictions, all of which make the pursuit of competent medical (+ legal) help even more difficult.

Given the medical malpractice + discrimination aspects to the case, in comportment with the spirit of the Arizona Revised Statutes Section 12-542(1), governing malpractice, Plaintiff argues that reasonable dates that the statute of limitations could begin tolling in this case include:

1) at its most restrictive, it can be reasonably argued that the toll for Plaintiff's Complaint did not begin until November 10, 2022, when Plaintiff finally obtained the formal diagnosis of her POTS condition, which conclusively refuted the diagnosis provided by Mayo Clinic.

Contrary to any Defense argument that this particular malpractice victim should have been well able to obtain a contrary diagnosis within the proscribed time limit, in fact, despite her considerable handicaps, the time to Plaintiff's formal

(3)

date of diagnosis was well under *"the average diagnostic delay for females (with POTS) of (5.0 ± 7.2 years* which existed as of <u>2019 (Covid)</u> – see Journal of Internal Medicine, cited below under, "General diagnostic delays in POTS".

 <u>General diagnostic delays in POTS</u>

A 2019 survey, published in the Journal of Internal Medicine, in which Defendant Mayo Clinic participated (see link to full text, below), demonstrated that a POTS diagnosis is - as it was for the current Plaintiff - more often than not, a multi-year quest, especially for females.

To wit:

Journal of Internal Medicine March, 2019

PDF: <u>JOI https://on https://onlinelibrary.wiley.com/doi/epdf/10.1111/joim.12895</u>

 *"The results of this survey demonstrate that POTS patients frequently experience a lengthy diagnostic delay. We found that patients waited a median 24 months from initial presentation to diagnosis, whilst the mean diagnostic delay was 4.9 ± 7.1 years, reflecting that some patients had extraordinarily long waits. These wait times are not unusual."*

In Plaintiff's case, despite her dogged persistence in the face of her infirmities, her diagnosis took over three years, as she had actually been suffering the symptoms of POTS since her surgery in September, 2019. (Exhibit #    ).

Had the Defendant been familiar with Mayo's own study on POTS, instead of stretching beyond credulity to saddle Plaintiff with a psychiatric diagnosis which simply did not fit her symptoms, she would have been aware that Plaintiff's

(4)

symptoms were those of classic POTS. She also might have been able to separate herself out from her obvious gender bias, common in diagnosing females with POTS.

Gender related diagnostic delays in POTS

Mayo Clinic itself endorsed the view that that gender bias influences the diagnosis of POTS.

Again, conclusions from the survey in which Mayo itself participated:

*"Despite the fact that POTS is a very female-predominant medical condition, females waited nearly 2 years longer (5.0 ± 7.2 years) for a POTS diagnosis than males (3.0 ± 4.4 years; P < 0.001), suggesting that gender bias may be influencing the diagnostic process."* There were no differences in diagnostic delay between races (P = 0.59)."

This misdiagnosis and diagnostic delay epidemic in POTS potentially affects millions of Americans.  Since the onset of Covid, Post-acute Covid associated POTS has flooded hospital ER's and the few existing public specialty clinics:

From the American Journal of Medicine

https://www.amjmed.com/article/S0002-9343(23)00402-3/fulltext

*"The majority (79%) of those with PASC (post-acute sequalae of COVID-19) met the internationally established criteria for POTS."*

Also

https://theconversation.com/what-is-pots-and-how-is-it-related-to-long-covid-208280

*"Our recent study found nearly 80% of people with long COVID had POTS. In people who had both and were of similar age, symptoms were indistinguishable from those who got POTS from other causes".*

(5)

As of April, 2024 (when data stopped being tracked), the CDC reports a total of 109,814,428 formally diagnosed Covid cases not resulting in death. This does not include the untold millions of Covid cases which were never formally reported. Applying just the official formally reported statistics cited above, coupled with the 79% figure of Covid victims who suffer from post-acute sequalae which meet the internationally established criteria for POTS cited by the Journal of American Medicine, that leaves a total of **86,753,395** Americans who have POTS.

**2) Plaintiff argues that an alternate date of August 9, 2023 could also reasonably apply to the beginning of tolling of the statute of limitations**, as that was the date that the late-July 2023 diagnosis of a stroke in her cerebellum was first entered into the record. (see attached Exhibit      )

The cerebellur stroke is medically associated with POTS symptoms. Even if the POTS diagnosis had been missed, the evidence for the fact the Plaintiff could have been experiencing a stroke was clear in the ER visit, due to the Plaintiff's extremely elevated (and ahistorical for the patient) heart rate (146!), which was left entirely unexplained and unaccounted for by any of the extensive blood work performed during the ER visit. The Plaintiff's elevated heart rate was of zero interest to the Defendant, nor was her previous surgery.

It would be remiss of me to miss arguing that the national Covid pandemic, which began *shortly after* my visit to Mayo Clinic Phoenix's E.D. in January, 2020, effectively prevented me from pursuing an alternate diagnosis for most of the *first year* - all time before the vaccine, when doctors and hospitals struggled to attend to patients already associated with the practice, and were effectively closed to new patients. This historically unusual circumstance further buttresses my arguments as to when statute of limitations tolling should begin.

(6)

**Summary**

Adopting a strict adherence to statute of limitations on medical malpractice due to discrimination which does not take into account, first, the unique nature of a medical injury (as opposed to financial or accidental injury), and secondarily, a once-in-a-century world-wide pandemic, would, in this case, result in vastly disproportional harm caused to Plaintiff's interest verses the interests of the Defendant.

Worse, a strict interpretation of the Statute of Limitations would actually reward Defendant's reckless disregard for its duty to the patients subject to their care. The Defendant completely disregarded and dismissed Plaintiff's very real physical distress – which, despite patient's best efforts to obtain an accurate diagnosis in the midst of a world-wide lockdown (including hiring of a *patient advocate* who could communicate with doctor's front offices and seek out the most promising specialists) consequently remained undiagnosed *for years.*

**Had Defendant taken *any* of Plaintiff's *physical symptoms* into account, there was a chance that Plaintiff would not have suffered the ongoing harm which was the inevitable result from any misdiagnosis, but particularly one which places the nexus of clinically significant physical symptoms in the patient's *psychiatric state*.**

**In light of the above, I respectfully request that the Defendant's Motion for Dismissal on the basis of Statute of Limitations be rejected.**

Pamela Moue

(7)

Addendum

CV-24-00452-DLR

Plaintiff's Response to Defendants Motions to Dismiss

Part II A. B. C. D. E.

Not otherwise covered in Plaintiff's Motions and/ or responses

A. Cured with Amended Complaint.

In addition, the Scottsdale Legal team has accepted service on behalf of Lindor in the past (see attached). If Defendant is going to insist on conducting business outside of the Rules of Civil Procedure by insisting on only email delivery, it's inconsistent to insist on two separate emails when the legal organization is receiving notice of service for two separate entities.

B. Plaintiff removed Mayo Clinic Minnesota from Amended Complaint

C. See separate response to Motion to Dismiss on Statute of Limitations

D. Cured with Amended Complaint

Also, see separate response to Defendant's Motion to Dismiss on the basis of

Jurisdiction

E. Cured with Amended Complaint

In addition

Re: Plaintiff Failure to State Claims

Defendant's Motion to Dismiss made incorrect assertions and factually

incorrect claims regarding Plaintiff failures to respond in the previous case CV-22-00399-PHX-MTL, both to specific deadlines and to requests for more evidence to substantiate Plaintiff's claims.

On page three, line 23, Defendant asserted that Plaintiff failed to respond to a June 2, 2023 deadline. That is factually incorrect. (See attached Exhibit showing the COC stamp on Plaintiff's June 2, 2023 filing)

In fact, the June 2, 2023 filing contained eight important exhibits substantiating claims:

1. Plaintiff's POTS Diagnosis

2. Evidence via NIH of reduced Cerebral Blood Flow in POTS patients

3. Severely reduced quality of life in POTS patients

4. Patient Limitations in POTS

5. Patient Advocate Summary of Plaintiff's condition and diagnosis, November 2022

6. List of cognitive deficits in POTS, photo of Plaintiff just 10 months prior to the sharp deterioration in her health and circumstances, Plaintiff's smart watch evidence of almost total lack of deep sleep.

7. POTS definition and how diagnosed

8. Brief additional narrative from Plaintiff regarding her Mayo E.D. visit Jan 5 2020

Plaintiff's August 2023 filing contained the stroke diagnosis from Plaintiff's current neurologist (Exhibit #3), Dopplar echograph studies showing reduced CBF in POTS patients (Exhibit # 1 via Science Direct), and also contained a one and one half page summary of Plaintiff's financial costs and losses. The repeated assertion that Plaintiff is not providing a basis for claims is simply untrue.

in Defendants's Motions to Dismiss submission, the entire discussion on page 5 from line 5 to line 22 is nothing but a gas-lighting exercise – a wholly  transparent attempt to deflect blame onto the Plaintiff for failure to serve in a timely manner. In reality, that situation was created entirely by the Defendant, who refuses to accept service other than by email – which, I have on the authority of two experienced process servers, is both outside the Rules of Civil Procedure, and also outside the capabilities and experience of most process servers. In fact, I remained in close communication with the Court , advising the Court at each step on exactly what steps I was taking  to accomplish service.

(2)

Your Name: Pamela More

Address: 16352 E Ridgeline Drive

City, State, Zip: Fountain Hills, AZ 85268

Phone Number: 602 515-1586

LODGED
_____ FILED          _____ RECEIVED          ✓ COPY

JUN 0 2 2023

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___KH___          DEPUTY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Pamela D. More          ,

Plaintiff,

v. Mayo Hospital et al.
AKA Mayo Clinic Az
                            ,

Defendant(s).

Case No: CV-22-00399-PHX MTL

Michael T. Liburdi

United States District Judge

Motion to introduce electronic media (thumb drive) to accompany the motion I filed today to seek extension to respond to defendants. Thumb drive has one photo on it, but it is referred to the filing and sufficiently important I believe it should be included.

Thank you.

Pamela More

(3)

 Gmail              JOHN OSBORN <info@asapserve.com>

---

## LEGAL DOCUMENTS FOR SEVICE OF PROCESS

---

**Pasion, Annette M.** <Pasion.Annette@mayo.edu>        Thu, Mar 30, 2023 at 9:07 AM
To: "info@asapserve.com" <info@asapserve.com>

Hello Susie,

Per attorney Rob Sonne, we accept service on behalf of Mayo Clinic and Dr. Rachel Lindor.

[Quoted text hidden]

---

**2 attachments**

📄 **MORE PAMELA-LAST DAY-40758.pdf**
281K

📄 **MORE PAMELA-DOCS-40758.pdf**
881K

(4)